# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
AUG 21 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
)  Case No.  **19MJ3553**
i-Phone XR, S/N: 353057109211923 )
iPhone XS Max, S/N: 353093100837440 )
LG Model LGMS210, S/N: 353191081521450 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the **Southern** District of **California**, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Conspiracy to Smuggle Aliens<br>Bringing In Aliens for Financial Gain |

The application is based on these facts:

See Affidavit of US Border Patrol Agent Daniel Scott.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Daniel Scott, US Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/21/19

_____
Judge's signature

City and state: San Diego, California

Bernard G. Skomal, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH OF:<br><br>Apple Cellular Telephone<br>Model: iPhone XR<br>S/N: 353057109211923<br><br>Apple Cellular Telephone<br>Model: iPhone XS Max<br>S/N: 353093100837440<br><br>BLUE LG Cellular Telephone<br>Model: LGMS210<br>S/N: 353191081521450 | **AFFIDAVIT OF DANIEL SCOTT IN SUPPORT OF SEARCH WARRANT** |

## AFFIDAVIT

I, Daniel A. Scott, Border Patrol Agent-Intelligence with the United States Department of Homeland Security, Customs and Border Protection, United States Border Patrol, having been duly sworn, depose and state as follows:

1. I make this affidavit in support of an application for a search warrant in furtherance of an alien smuggling investigation conducted by U.S. Border Patrol ("USBP") Agents for the following cellular telephones, which are referred to collectively as the "**Target Telephones**":

- One cellular telephone seized on August 14, 2019 from Luis MACIAS. The cellular telephone is (1) Apple iPhone; S/N: 353057109211923.
- One cellular telephone seized on the same date from Jaime TAICH. The cellular telephone is (2) Apple iPhone; S/N: 353093100837440.

- One cellular telephone seized on the same date from Thomas Zachary BRUNDIGE. The cellular telephone is (3) Blue LG Cellular Telephone; S/N: 353191081521450.

2. The **Target Telephones** were seized from MACIAS, TAICH, and BRUNDIGE after they were apprehended in a black BMW and a black Scion xB while attempting to transport one illegal alien. It is believed that the **Target Telephones** were used by MACIAS, TAICH, and BRUNDIGE to communicate with co-conspirators during an alien smuggling event on August 14, 2019. MACIAS, TAICH, and BRUNDGIE are being investigated for Transportation of Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), in the Southern District of California. Probable cause exists to believe that **Target Telephones** contain evidence relating to violations of Title 8, United States Code section 1324. The specified telephones are currently in the possession of the Customs and Border Protection Chula Vista Border Patrol Station, 311 Athey Street, San Diego, California 92173.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized, as set forth in Attachment B (incorporated herein), will be found in the items to be searched, as described in Attachment A (incorporated herein). These items may be or lead to: (1) evidence of the existence of alien smuggling or conspiracy to smuggle aliens in violation of 8 U.S.C. § 1324; (2) contraband, fruits of crime, or things otherwise criminally possessed; and (3) property designed or intended for use as, or which is or has been used as, a means of committing criminal offenses.

### EXPERIENCE AND TRAINING

4. I am a USBP Agent-Intelligence within the United States Department of Homeland Security, Customs and Border Protection, USBP. I have been employed as a USBP Agent since October 2010. I am presently assigned to the San Diego Sector Intelligence Unit at the Campo Border Patrol Station. I am a graduate of the United States Border Patrol Academy at the Federal Law Enforcement Training Center in

2

Artesia, New Mexico. I have received basic training in investigating alien smuggling, identifying immigration violations, and enforcing numerous immigration and customs laws within the United States.

5. I am currently assigned to conduct investigations of criminal violations relating to alien smuggling. I have participated in numerous alien-smuggling-related investigations, many of which involved the arrest of persons for alien smuggling offenses. In those cases, I conducted interviews with the arrested persons and with their associates. Through these interviews, I have gained a working knowledge of and insights into the activities and operations of alien smugglers.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones and portable radios to maintain communications with co-conspirators to further their criminal activities. I am also aware that it is a common practice for alien smugglers to communicate with the smuggled aliens regarding smuggling arrangements and payment utilizing cellular telephones and portable radios. Conspiracies involving alien smuggling generate many types of evidence, including, but not limited to, voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators and aliens to be smuggled.

7. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of alien smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

8. Based upon my training and experience as a USBP Agent-Intelligence, and consultations with law enforcement officers experienced in alien smuggling

investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, texts, the internet, and voice messages.

    b. Alien smugglers will use cellular telephones because they are able to actively monitor the progress of the illegal aliens while they are in transit.

    c. Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time the smuggled aliens will arrive at predetermined locations.

    d. Alien smugglers will use cellular telephones to direct drivers to synchronize a drop off and/or pick up time for the smuggled aliens.

    e. Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units, as well as the operational status of USBP checkpoints.

    f. Alien smugglers will use cellular telephones to make arrangements with the smuggled aliens prior to the smuggling event, and to arrange for payment after the smuggling event.

    g. Alien smugglers will use GPS devises in remote areas to guide them to the location of the aliens to be smuggled, as well as to the final destination of the smuggled aliens.

## FACTS SUPPORTING PROBABLE CAUSE

9. On July 30, 2019, at approximately 3:35 p.m., I received a phone call from the Campo Border Patrol Checkpoint stating that Luis MACIAS was currently detained for being in possession of marijuana. MACIAS is a documented alien smuggling recruiter and coordinator. At the checkpoint, agents discovered that Luis MACIAS was traveling in a black BMW bearing California plates 8KFT537. MACIAS was traveling with two other occupants: Jaime TAICH-Cruz and Adrian Daniel MELENDREZ. BPA-I Contreras interviewed MELENDREZ, who stated that he was picked up by MACIAS

4

in San Ysidro, California that morning in the black BMW. MACIAS told MELENDREZ they would be driving towards the Golden Acorn Casino in Campo, California. Once they arrived at the Golden Acorn Casino, MELENDREZ stated that MACIAS began to coordinate alien smuggling events on his cellular phone.

10. MELENDREZ stated that MACIAS used multiple phones and that one of the phones was his own cellular phone. BPA-I Contreras then asked MELENDREZ for consent to access his cellular phone and have MELENDREZ show him how MACIAS had used his phone. MELENDREZ consented and began to show BPA-I Contreras a "WhatsApp" conversation with a contact named "Abel." The conversation contained a discussion about meet up locations, aliens being picked up by the border, intended drop off locations in Los Angeles, California, and information regarding Border Patrol checkpoints and Border Patrol Agent activity in the area. Based on this information, agents believed that MACIAS was guiding alien smuggling events to the Los Angeles, California area and overseeing "buy outs." A buy out is the moment when a sponsor pays smuggling fees to smugglers for successfully delivering a smuggled alien.

11. On August 14, 2019, Campo Station Intelligence Team agents were monitoring a tracking device on a black BMW registered to Luis MACIAS. Agents noticed that the BMW was heading north on Interstate 15. This was the first time in a week of monitoring the BMW that agents had seen it head north and leave San Diego County. Agents believed that the BMW was heading to complete a "buyout" where the sponsors of illegal aliens pay smugglers for their friends and family.

12. BPA-I Benjamin Moretti began traveling north on the Interstate 15. He observed on the tracker that the vehicle came to a stop at the Scottish Inns and Suites located at 210 Lincoln Ave. Corona, California, 92882. Around 7:40 p.m., BPA-I Moretti arrived at the gas station and saw the BMW there. Agents began physical surveillance of the BMW at this time.

13. Around 8:15 p.m., BPA-I Adnane Benchekroun arrived at the hotel parking lot to set up surveillance. About ten minutes later, the BMW pulled into the

parking lot of the hotel and parked immediately next to BPA-I Benchekroun's unmarked agency issued vehicle. A few minutes later, the vehicle pulled away and parked on the north side of the building. Less than a minute later, BPA-I Benchekroun observed a subject wearing a blue shirt and dark jeans walk up the staircase and into room 214. The subject was in the room for less than a minute before he left and walked toward the gas station. Around 8:31 p.m., BPA-I Leonardo Contreras, who was conducting surveillance from the Shell gas station south of the hotel, positively identified the subject in the blue shirt as Jaime TAICH-Cruz and confirmed that he is associated with the black BMW target vehicle.

14. At roughly 9:37 p.m., BPA-I Benchekroun observed a female, later identified as Nadia ROMERO Corona, exit room 214. While standing on the walkway in front of the room, ROMERO appeared to be looking at all the cars in the parking lot.

15. About a minute after ROMERO walked back into the room, a male subject, later identified as Thomas Zachary BRUNDIGE, exited room 214, went downstairs to the parking lot, and walked to a black Scion xB bearing California license plates 6CKK011. Less than a minute later, BRUNDIGE walked back into room 214. Around 9:42 p.m., ROMERO and BRUNDIGE walked back out of room 214 accompanied by a third Hispanic male adult with a beard wearing a black short sleeve shirt and dark pants. All three walked down to the parking lot towards the Scion. BRUNDIGE got into the vehicle while ROMERO and the Hispanic male adult, later identified as smuggled alien Luis ALFARO-Cortes, stood outside of the car for several minutes. Around 10:07 p.m., ROMERO and ALFARO got into the vehicle with BRUNDIGE and they drove out of the parking lot. After the Scion xB left, it drove around with no intended destination.

16. At about 10:30 p.m., BPA-I Moretti was stationary in the middle of the Cardenas Grocery parking lot located on the southeast corner of the intersection of 2nd Street and Lincoln Ave at 301 S Lincoln Ave. At this time, BPA-I Moretti observed a red Honda Civic bearing California license plates 5PLH170 park one space to his right.

6

The vehicle had three occupants. One individual exited from the back seat of the vehicle and began walking toward the hotel at the northeast corner of 2nd Street and Lincoln Ave. This individual was later identified as sponsor Marco Antonio CORTES-Coello.

17. Around 10:46 p.m., CORTES returned to the red Honda and the BMW entered the parking lot and parked behind the red Honda. At 10:49 p.m., agents observed the Scion xB return to the hotel. CORTES begin walking back to the hotel. At about 10:51 p.m., Agent Benchekroun observed ALFARO and CORTES meet at the Scion, hug, and begin walking back south in the direction of the red Honda. In BPA-I Moretti's training and experience, this is consistent with a smuggled alien being reunited with a sponsor who will be paying the smuggling fees.

18. At about 10:52 p.m. BPA-I Moretti observed TAICH exit the passenger seat of the red Honda and enter the passenger seat of the BMW. The red Honda then traveled to the western end of the parking lot and parked while the BMW exited the lot. At approximately 10:55 p.m., BPA-I Moretti observed CORTES and ALFARO approach the red Honda and get in.

19. Around 10:55 p.m., BPA-I Nate Romero and BPA-I Ehab Rahman approached the Honda. They questioned CORTES and ALFARO as to their citizenship. p.m. Both stated that they were citizens of Mexico and did not have documentation allowing them to be in the United States legally. At approximately 11:00, BPA-I Rahman arrested CORTES and ALFARO.

20. At approximately 10:50 p.m., BPA-I Contreras began to follow the Black BMW that attempted to flee the area after the buyout. Agents relayed that CORTES and ALFARO were under arrest for 8 U.S.C. § 1324 alien smuggling. BPA-I Contreras, hearing this, activated his emergency lights and sirens on the corner of West Sixth Street and South Smith Avenue after getting a visual of the BMW. The driver of the BMW, later identified as Luis MACIAS, began to drive North on South Smith Avenue at a high rate of speed. MACIAS then made an abrupt right turn onto Pleasant View Avenue and came to a stop about halfway down the street. At approximately 11:00 p.m., BPA-

Contreras placed the driver MACIAS and passenger, later identified as Jaime TAICH Cruz, under arrest for violating 8 U.S.C § 1324.

21. MACIAS and TAICH each had their respective **Target Telephones** on their person at their time of arrest.

22. During post arrest interviews of BRUNDIGE and ROMERO, both identified TAICH as the person organizing the smuggling event. BRUNDIGE and ROMERO both stated that they communicated with TAICH using the **Target Telephones**. BRUNDIGAGE also stated that he was guided via the **Target Telephones** to the location to pick up ALFARO near the international border in Campo, California. Based on my experience and investigation in this case I believe that MACIAS and TAICH may have guided BRUNDIGE to the pickup location for ALFARO.

23. Based on my experience and investigation in this case, I believe that MACIAS, TAICH, and BRUNDGIE, as well as other unknown persons, were involved in an on-going conspiracy to smuggle aliens. Based on my experience investigating alien smugglers, I also believe that MACIAS, TAICH, and BRUNDGIE may have used the **Target Telephones** to coordinate with co-conspirators regarding the smuggling of illegal aliens, and to otherwise further this conspiracy both inside and outside the United States. I also believe that MACIAS, TAICH, and BRUNDGIE may have used the **Target Telephones** to aid them in the recovery of the illegal aliens near the United States Mexico border.

24. Based on my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the alien smuggling activities of MACIAS, TAICH, and BRUNDGIE and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the cellular telephone described herein.

## SEARCH PROTOCOL

25. It is not possible to determine, merely by knowing the cellular telephone's make, model, and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

27. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel

9

conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

28. Following the issuance of this warrant, I will collect the subject cellular telephone and, with assistance if necessary from cellular telephone forensic examiners, will attempt to securely power the devices, identify whether they are protected by a personal identification number (PIN), determine or circumvent the PIN and image or retrieve data subject to seizure pursuant to this warrant from the device. The search of the devices or of an image on the data on the device will be limited to identifying and seizing data subject to seizure pursuant to this warrant and, in any event, will be limited to only the information to be found on basic cellular telephones: digital, cellular, and/or telephone numbers and/or direct connect numbers assigned to the device; call and direct connect history information; list of contacts stored on the device; text messages stored on the device; and, if equipped as a camera, photographs and videos stored on the device. In the event that I or other personnel lawfully conducting the analysis identify information pertaining to crimes outside the scope of the warrant, such information will not be used in any way unless a new warrant is obtained to search for such information.

29. I, or any other duly authorized federal agent, will personally serve the warrant requested above, and will be assisted by other duly authorized federal investigators.

## CONCLUSION

30. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that MACIAS, TAICH, and BRUNDGIE used the **Target Telephones** to facilitate alien smuggling. The **Target Telephones** were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 8, United States Code, Section 1324.

31. I also believe that probable cause exists to indicate that evidence, fruits, and instrumentalities of illegal activity committed by MACIAS, TAICH, and BRUNDGIE continues to exist on the **Target Telephones**.

32. Based on my experience and training, consultation with other agents in alien smuggling investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized, as set forth in Attachment B (incorporated herein), are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, a USBP Agent, or another federal law enforcement agent specially trained in digital evidence recovery, to search the item described in Attachment A, and seize the items listed in Attachment B.

33. I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
DANIEL SCOTT
Border Patrol Agent
U.S. Border Patrol

SUBSCRIBED AND SWORN TO ME BEFORE THIS 21 DAY OF AUGUST, 2019.

_____
HONORABLE BERNARD G. SKOMAL
United States Magistrate Judge

11

ATTACHMENT A

The following items ("**Target Telephones**") are to be searched:

(1)  Apple Cellular Telephone
     Model: iPhone XR
     S/N: 353057109211923

(2)  Apple Cellular Telephone
     Model: iPhone XS Max
     S/N: 353093100837440

(3)  BLUE LG Cellular Telephone
     Model: LGMS210
     S/N: 353191081521450

These items are currently in the possession of the Customs and Border Protection Chula Vista Border Patrol Station, 311 Athey Street, San Diego, CA 92173.

ATTACHMENT B

ITEM TO BE SEIZED

Authorization to search the **Target Telephones** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the **Target Telephones** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Telephones** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 1, 2019 to August 15, 2019.

    a.    tending to indicate efforts to smuggle aliens into the United States from Mexico or transport illegal aliens within the United States;

    b.    tending to identify other facilities, storage devices, or services-such as email addresses, IP addresses, phone numbers-that may contain electronic evidence tending to indicate efforts to smuggle aliens into the United States from Mexico or transport illegal aliens within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the efforts to smuggle aliens into the United States from Mexico or transport illegal aliens within the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling of aliens into the United States from Mexico or transporting illegal aliens within the United States such as drop off and pick up locations, stash houses, load houses, or delivery points;

    e.    tending to indicate payment for the smuggling of aliens into the United States or the transportation of aliens with in the United States;

    f.    tending to identify the user of, or persons with control over or access to, the **Target Telephones**; or

    g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, record, or data above.

**which are evidence of violations of 8 U.S.C. § 1324 (Alien Smuggling).**